## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 18-21726-CIV-COOKE

CRAIG JUNGWIRTH,

     Plaintiff,

     v.

UNITED STATES OF AMERICA, *et al.*,

     Defendants.

_____/

## DEFENDANT UNITED STATES' MOTION TO DISMISS
## PLAINTIFF'S CLAIM AGAINST IT

Defendant United States moves this Court under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff Craig Jungwirth's common-law tort claim against it because Jungwirth has failed to state a claim upon which relief may be granted.

## INTRODUCTION

This case is about federal law enforcement's efforts to prevent a threatened act of domestic terrorism in the wake of the Pulse nightclub shooting, which claimed the lives of forty-nine people. In late-August 2016, two months after that shooting, numerous individuals and local law enforcement officers notified the Federal Bureau of Investigation (FBI) that someone with the Facebook screen name "Craig Jungwirth" threatened the gay community of Wilton Manors with violence exceeding what occurred at Pulse nightclub. Those threats were set to be carried out in a mere six days.

Under pressure and faced with the threat of an imminent terrorist attack, the FBI undertook a thorough investigation, obtaining as much information as it reasonably could in the handful of days before a proverbial ticking time-bomb exploded. All the available information

the investigation revealed pointed towards Plaintiff Craig Jungwirth as the originator of those threats. Two days before the time set for the attack, the United States charged Jungwirth with posting threatening communications, placed him under arrest, and detained him. Ultimately, the United States dismissed the charges. But not before a neutral magistrate considered the evidence the United States had collected, heard from Jungwirth's defense counsel, and determined that the charges against Jungwirth should remain. Jungwirth now brings a claim for malicious prosecution against the United States. That claim should be dismissed. The United States had probable cause. And it acted properly in confronting the imminent threat of terrorist violence the people of Florida faced.

## BACKGROUND[1]

According to Jungwirth's complaint, on August 30, 2016, an unknown individual using the screen name "Craig Jungwirth" posted on Facebook or a format that appeared to be Facebook the following message: "My events are selling out cause you f*ggots are total patsies. None of you deserve to live. If you losers thought the Pulse nightclub shooting was bad, wait till you see what I'm planning for Labor Day." Compl. ¶¶ 7, 11; Doc. 4-2. Four minutes later, in response to a reaction to the original post, "Craig Jungwirth" added: "You can never catch a genius from MIT and since you f*ggots aren't dying from AIDS anymore, I have a better solution to

---

[1] For purposes of this motion to dismiss only, the Court may assume the veracity of the well-pled factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 769 (2009). The court may also consider in a motion to dismiss under Rule 12(b)(6) documents that are referred to in the complaint whose contents are not under dispute and which are central to the claims, provided those documents are attached to the motion. *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). The following two documents, the contents of which are not under dispute, are referred to in the complaint and are presented as central to Jungwirth's claim: the criminal complaint and accompanying affidavit signed by Special Agent Elisa Germano, *see* Compl. ¶¶ 25-36; and the transcript of the November 15, 2016 bond hearing. *See id.* ¶ 40. Those documents are incorporated by reference in this motion and are provided to the Court. *See* Ex. 1, Crim. Compl.; Ex. 2, Bond Hrg. Tr.

2

exterminate you losers." Doc. 4-2. Shortly after that, in response to another reaction, "Craig Jungwirth" concluded: "I'm gonna be killing you f*gs faster than cops kill n*ggers. It's time to clean up Wilton Manors from all you AIDS infested losers." *Id.* Two months before these posts, at the Pulse nightclub, a gay nightclub in Orlando, Florida, a terrorist shot and killed forty-nine people and wounded fifty-three others in what was, at the time, the deadliest mass shooting by an individual in United States history, and the deadliest attack on United States soil since 9/11. *See* Ex. 1, Crim. Compl., at ¶ 6. Wilton Manors is a gay community located in Miami, Florida. *Id.* at ¶ 4. That year, Labor Day was on September 5, six days after the threats were posted.[2]

Numerous individuals and local law enforcement officers forwarded the threatening posts to local law enforcement and to the FBI. Compl. ¶ 14. Members of the FBI's Miami Joint Terrorism Task Force then began an investigation. *Id.* ¶¶ 4-5, 25. Local law enforcement in Wilton Manors identified Jungwirth as a past resident who had been the subject of numerous complaints for harassing and stalking other residents of Wilton Manors. Ex. 1, Crim. Compl., at ¶ 7. The day after the posts appeared, local law enforcement and an FBI agent approached Jungwirth, who refused to speak with the officers and, before the officers had shown him the threats, denied posting them. Compl. ¶¶ 23-24; Ex. 1, Crim. Compl., at ¶ 9.

Over the next several days, FBI agents learned that Jungwirth had a Facebook account in the name "Craig Jungwirth"; that he had attended MIT; that he had accessed his Facebook account on August 30, 2016, from his mother's house; that he had multiple Facebook accounts, including fake accounts using the likeness of other individuals; that the image of "Craig

---

[2] *See* https://www.opm.gov/policy-data-oversight/snow-dismissal-procedures/federal-holidays/#url=2016 (last visited July 11, 2018). Courts may take judicial notice of such undisputed matters as the dates of federal holidays. *See Paniagua v. Comm'r of Soc. Sec.*, No. 15-cv-2038, 2017 WL 699117, at *3 n.7 (S.D.N.Y. Feb. 21, 2017).

Jungwirth" on the threatening posts was actually that of a disc jockey in the Miami area who was connected to the Wilton Manors community; that Jungwirth had harassed and threatened a denizen of Wilton Manors to such a degree that that person feared for his or her personal safety; that Jungwirth had acted aggressively towards others in Wilton Manors, recently causing a gay establishment to increase its security; and that a restraining order had been entered against him in Wilton Manors one month earlier. *See* Ex. 1, Crim. Compl., at ¶¶ 11-16.

On September 3, two days before Labor Day, an FBI agent filed a criminal complaint and supporting affidavit against Jungwirth, charging him with a single violation of 18 U.S.C. § 875(c) for transmitting a threatening communication. *Id.* at 1. Jungwirth was arrested and originally held without bond. Compl. ¶ 36. Two weeks later, a grand jury indicted Jungwirth. *See* Ex. 3, Indictment.[3] On November 15, 2016, at a bond hearing, the United States stated it had received only a screen shot of the post and conceded that it could not locate the original post. Compl. ¶ 39. It therefore could not yet verify that the threats in fact had been posted from Jungwirth's Facebook account, or that Jungwirth had been on his Facebook account at the precise time that the threats were posted, contrary to statements in the affidavit supporting the criminal complaint. *Id.* ¶¶ 30-32, 39. The magistrate judge presiding over the hearing granted Jungwirth a $250,000 bond, but placed him under house arrest with electronic monitoring and no internet use. *See* Ex. 2, Bond Hrg. Tr., at 22:13-20. In January 2017, the United States dismissed the charge against Jungwirth. Compl. ¶ 41.

Jungwirth asserts that an unknown individual in Los Angeles, California, is the one who posted the threats, not him. Compl. ¶¶ 7-12. He alleges that Special Agent Germano, who signed

---

[3] Courts may take judicial notice of matters of public record in considering a Rule 12(b)(6) motion to dismiss. *See Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010).

4

the affidavit supporting the criminal complaint, knowingly made three false statements in the affidavit: (1) that Jungwirth's Facebook account was the source of the threats; (2) that the IP address at Jungwirth's mother's house was the source of the threats; and (3) that Jungwirth was on his Facebook account when the threats were posted. *Id.* ¶¶ 30-32. Jungwirth does not dispute any other assertions in the criminal complaint. *See generally* Compl. Jungwirth claims, however, that Special Agent Germano made several material omissions in the affidavit, namely, that Jungwirth was a gay businessman with business interests in the Miami area, and that the image associated with the threats was not Jungwirth. *Id.* ¶¶ 33-35.

Based on these allegations, Jungwirth brings a single claim against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(l), 2671-2680 (2012) (FTCA). Although he does not specify which common-law tort provides the basis for his claim, the United States construes it as a claim for malicious prosecution. *See* Compl. ¶ 45. Jungwirth also brings two constitutional claims against Special Agent Germano in her individual capacity. *Id.* at 10-13. Those claims are addressed by a motion filed separately by Special Agent Germano.

The United States now moves to dismiss Jungwirth's malicious prosecution claim because it had probable cause to charge Jungwirth and to continue the prosecution against him.

## **ARGUMENT**

Jungwirth's malicious prosecution claim fails for one overarching reason: the United States had probable cause to charge him. First, even absent the misstatements in the affidavit, on September 3, 2016, there existed probable cause to believe that Jungwirth had committed the violation for which he was charged. Second, the November 15, 2016 bond hearing conclusively demonstrates the previous point. The magistrate judge was aware of the purported misstatements in the affidavit and the limitations on the United States' evidence. Nonetheless, he did not

dismiss the criminal complaint or the grand jury indictment against Jungwirth. Instead, he released him on bond, placed him under house arrest, and forbade him from internet use. This conclusively demonstrates probable cause. Jungwirth's claim should therefore be dismissed.

## I.     Probable Cause Existed To Charge and Prosecute Jungwirth.

The United States had ample probable cause to charge Jungwirth with posting online statements explicitly threatening egregious harm against a specific community that had recently suffered a horrific attack, and to continue its prosecution of him until it dismissed the indictment. His malicious prosecution claim therefore fails.

### A.  The standard for assessing Jungwirth's malicious prosecution claim.

In assessing claims brought under the FTCA, courts look to the law of the state where the alleged act or omission occurred. *See* 28 U.S.C. § 1346(b)(1); *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017). Because all the alleged acts or omissions here occurred in Florida, Florida state law governs Jungwirth's malicious prosecution claim.

#### i.     Malicious prosecution claims under Florida state law.

To prevail on a malicious prosecution claim, a plaintiff must prove six elements: (1) the commencement of a criminal or civil proceeding; (2) causation of that proceeding by the current civil defendant; (3) termination of the proceeding in favor of the current plaintiff; (4) the absence of probable cause to initiate the proceeding; (5) malice; and (6) damages caused by the proceeding. *See Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986).

The tort of malicious prosecution involves the "balancing" of "various interests." *Id.* at 1219. On the one hand, individuals have the right to be protected from unwarranted criminal prosecution. *Id.* On the other, "the need of society to bring criminals to justice by protecting those who, in good faith, report and legally prosecute persons apparently guilty of crime must be

balanced." *Id.* In balancing these interests, Florida has placed "a particularly heavy burden of proof" upon the plaintiff. *Id*. That burden includes the "onerous requirement" of proving the absence of probable cause. *Id.* Although the United States disputes at least one of the other five elements of malicious prosecution in this case—malice—Jungwirth's inability to satisfy his "onerous requirement" of proving the absence of probable cause is dispositive.

ii.   **Probable cause.**

Probable cause is a "fluid concept." *City of Clearwater v. Williamson*, 938 So. 2d 985 (Fla. Dist. Ct. App. 2006) (quoting *City of St. Petersburg v. Austrino*, 898 So. 2d 955, 957-58 (Fla. Dist. Ct. App. 2005)). As the "very name implies," probable cause deals with "probabilities," which are "not technical," but rather "are the factual and practical considerations of everyday life on which reasonable and prudent" individuals act. *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Thus, probable cause allows for "some mistakes on their part," so long as those mistakes are "reasonable," based on "facts leading sensibly to" those reasonable individuals' conclusions. *Id.* at 176. *See also Williamson*, 938 So. 2d at 988-89 ("[Probable cause] affords law enforcement officers some latitude for error." (citation omitted)).

The level of proof needed to demonstrate probable cause is less than the level necessary to show a preponderance of the evidence. *See Nnadi v. Richter*, 976 F.2d 682, 687 (11th Cir. 1992) (citing *United States v. $41,305 in Currency & Traveler's Checks*, 802 F.2d 1339, 1343 (11th Cir. 1986)); *Montgomery v. Brickell Place Condo. Ass'n*, No. 11-cv-24316, 2012 WL 1203837, at *2 (S.D. Fla. Apr. 11, 2012) (citing *United States v. Lightbourn*, 357 F. App'x 259, 263 (11th Cir. 2009)). It certainly is less than that needed to show proof beyond a reasonable doubt. *See Chavez v. State*, 832 So. 2d 730, 747 (Fla. 2002) ("The standard of conclusiveness and probability is less than that required to support a conviction." (citation omitted)).

Accordingly, the level of proof required to demonstrate the *absence* of probable cause, which Jungwirth must meet here, is correspondingly high. *Cf. Burns* 502 So. 2d at 1219 (describing the burden on plaintiff as "onerous").

The standard for determining whether probable cause exists "is the same under Florida and federal law." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). For probable cause to exist, an arrest must be "objectively reasonable under the totality of the circumstances." *Id.* (quoting *Bailey v. Bd. of Cnty. Comm'rs of Alchua Cnty.*, 956 F.2d 1112, 1119 (11th Cir. 1992)). That standard is met when the "facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . or is about to commit an offense." *Rankin*, 133 F.3d at 1435 (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)). And although an arresting officer "is required to conduct a reasonable investigation," he or she need not take "every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person." *Rankin*, 133 F.3d at 1436 (quoting *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989)). Moreover, an arresting officer need not "rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct, 577, 588 (2018).

Under the "totality of the circumstances," the gravity of a crime and the exigencies surrounding it inform the reasonableness of an officer's efforts to establish probable cause. The amount of information officers are required to gather to establish probable cause for an arrest "is in inverse proportion to the gravity of the crime and the threat of its imminent repetition." *Mason v. Godinez*, 47 F.3d 852, 856 (7th Cir. 1995). *See United States v. Bustamante-Gamez*, 488 F.2d 4, 8 (9th Cir. 1973) (noting "[t]ime was clearly of the essence" in finding probable cause for arrest); *Ellis v. Vance*, 227 F. Supp. 3d 627, 637 (N.D. Miss. 2017) (finding arrest for assault

8

reasonable even though officer did not view exonerating video because officer "had reason to believe that time was of the essence"). *Cf. United States v. Roberts*, 548 F.2d 665, 668 (6th Cir. 1977) (affirming denial of motion to suppress because misstatements were immaterial to probable cause and resulted from good faith error in light of "the pressures of time involved").

**B. The United States Had Abundant Probable Cause Here.**

Applying the above principles to the undisputed facts in this case, there can be little doubt that the United States had probable cause to arrest and prosecute Jungwirth for making online threats. Certainly, Jungwirth cannot meet his "onerous requirement" of demonstrating that the United States *lacked* probable cause.

**i. The crime committed.**

Jungwirth was charged with violating 18 U.S.C. § 875. *See* Ex. 1, Crim. Compl., at 1. That statute makes it a crime to transmit "in interstate . . . commerce any communication containing . . . any threat to injure the person of another." § 875(c). Jungwirth does not dispute that the online communications at issue here involved interstate commerce. *See generally* Compl. Nor does he dispute that those communications contained a "threat to injure the person of another." *Id.* Thus, the only question is whether the United States had probable cause to believe that *he* was the one who had posted those threats. Given the information reasonably available at the time, it clearly did. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials."); *United States v. Webster*, 314 F. App'x 226, 229 (11th Cir. 2008) (whether officer has reasonable suspicion for stop is "based on the

information available to the officer at the time" (citing *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992))).

      **ii.**        **Connections between the posts and Jungwirth.**

First, what reasonably appeared to be a series of threatening Facebook posts were from the screen name "Craig Jungwirth." *See* Doc. 4-2. The United States verified that Jungwirth in fact had an account with Facebook in the screen name "Craig Jungwirth." *See* Ex. 1, Crim. Compl., at ¶ 11.

Second, the threatening posts referred to "Craig Jungwirth" as having studied at MIT. Doc. 4-2. The United States verified that Jungwirth in fact had attended MIT, and he listed an MIT email address as one of the email accounts associated with his Facebook page. *See* Ex. 1, Crim. Compl., at ¶ 11. Third, based on the information readily available, although the posts did not provide the precise time they came online, they appeared to have been posted on August 30, 2016. Compl. ¶¶ 7-12. The United States verified that Jungwirth had accessed his Facebook page, named "Craig Jungwirth," on that day from an IP address associated with his mother's house. *See* Ex. 1, Crim. Compl., at ¶¶ 11, 16.

      **iii.**        **Jungwirth's history with Wilton Manors.**

Fourth, the posts threatened the gay community of "Wilton Manors." Doc. 4-2. The United States verified that Jungwirth had associations with the gay community of Wilton Manors in Miami, Florida. *See* Ex. 1, Crim. Compl., at ¶ 13. Not only did the United States verify that Jungwirth was associated with that community, but it learned additional relevant information that supported a reasonable belief that Jungwirth in fact had posted the threats. Namely, it learned that multiple complaints had been filed against him for "stalking and harassing behavior," along with "incidents of sabotage, vandalism, and trespassing." *Id.* at ¶ 12. It also learned that one

nightclub in that community had "increased security" recently because of Jungwirth and his "aggressive" behavior. *Id.* at ¶ 13. In interviews with another individual in Wilton Manors, the United States learned that Jungwirth had bombarded that individual with "thousands of threatening text messages, Facebook messages, and phone calls," often with Jungwirth stating "I'm going to get you"; that this individual had obtained a restraining order against Jungwirth in mid-July 2016, six weeks before the threatening Facebook posts at issue here; and that because of Jungwirth, this individual "feared for their physical safety." *Id.* at ¶ 15.

And fifth, the United States learned that Jungwirth had "multiple Facebook profiles," had created "false online profiles" using other individuals' names and likenesses, *id.*, and that the photograph included with the threatening posts at issue here was of another individual who worked in the Miami area and who was not Jungwirth. *Id.* at ¶ 13. (In this respect, the affidavit itself conclusively disproves Jungwirth's allegation that the affidavit omitted the fact that the corresponding photograph was not of Jungwirth. *See* Compl. ¶ 33.)

Additionally, when officers first approached Jungwirth to discuss the posted threats, before the officers had shown him the threats, he denied posting them. *See* Ex. 1, Crim. Compl., at ¶ 9. That suspicious behavior further supported a finding of probable cause. *See Williamson*, 938 So. 2d at 989 (noting that plaintiff identified alleged victim of crime before officers had identified victim). Jungwirth then refused to speak with the officers without his attorney. Compl. ¶ 24.

### iv. Under the totality of the circumstances, there was probable cause.

When considering the "totality of the circumstances," including the severity of the crime the posts threatened and the imminence of that crime, the above undisputed facts would have led a reasonable officer to believe that Jungwirth had committed a crime and should be arrested. The

posts threatened to commit an act of terrorism exceeding the Pulse nightclub shooting—which killed forty-nine people and wounded fifty-three others, and was at the time the deadliest mass shooting by a single assailant in United States history, *see* Ex. 1, Crim. Compl., at ¶ 6—and targeted a similar community, the gay community in Wilton Manors. This threat came a mere two-and-a-half months after that horrific shooting; was associated with the name of an individual, Jungwirth, who lived in Orlando, the site of the shooting; and targeted a similar community in the same state. As detailed above, all reasonably available information pointed towards Jungwirth as the perpetrator of the online threats posted in his name, and the United States' investigation and interviews with individuals in Wilton Manors further supported the conclusion that Jungwirth in fact had made the threats and had a motive to carry them out.

The alleged misstatements in the affidavit do not alter this analysis. That is because, as described above, the United States had probable cause without those misstatements. The undisputed information otherwise contained in the criminal complaint against Jungwirth still provided probable cause. It certainly does not provide room for Jungwirth to show an absence of probable cause. And regarding the purported omissions Jungwirth raises—one of which in fact was not omitted from the affidavit, *see supra*, p.11—even assuming those omissions would have been exculpatory, an officer is under no obligation to provide exculpatory information to a judge when filing a complaint or to a grand jury when seeking an indictment. *See United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004) ("The government is under no duty to bring exculpatory evidence to the grand jury's attention."); *United States v. Gilbert*, 198 F.3d 1293, 1304 (11th Cir.1999) ("To begin with, it is settled law that the prosecution is not required to include exculpatory evidence in its presentation to the grand jury.").

In sum, the undisputed facts available at the time demonstrate that the United States had probable cause to charge and prosecute Jungwirth. He certainly is unable to demonstrate the absence of probable cause. His malicious prosecution claim should be dismissed.

## II.     The Magistrate Judge's Bond Hearing Order Conclusively Establishes Probable Cause.

Moreover, the November 15, 2016 bond hearing before a magistrate judge demonstrates that the alleged misstatements and omissions in the affidavit do not negate probable cause. Indeed, that hearing conclusively establishes that the United States had probable cause throughout the prosecution.

Under Florida law, a magistrate judge's finding of probable cause after an adversarial hearing, in which the criminal defendant had the opportunity to refute the allegations supporting probable cause, conclusively establishes that there was probable cause to bring the prosecution. *See Burns*, 502 So. 2d at 1218-19.

At the bond hearing Jungwirth cites and quotes from in his complaint, *see* Compl. ¶ 40, the issue of those misstatements was argued before a magistrate judge. Jungwirth quotes in his complaint a portion of the transcripts, namely, the magistrate judge's question at the bond hearing after being informed by the United States that it could not at that time definitively confirm who posted the threats and precisely when they were posted, "What was the basis for your probable cause then?" *Id.* (quoting from transcript of Nov. 15, 2016 bond hearing). Jungwirth, however, fails to quote the prosecutor's response to that question, and also fails to mention the outcome of that bond hearing. In response, the prosecutor stated:

> The basis for the probable cause was that the post was in the name of Craig Jungwirth who indicated that he had gone to MIT and had a history with the Wilton Manors community, that a user by the name of Craig Jungwirth was in fact on line, that the IP address resolved back to a Craig Jungwirth's mom's house in Orlando, Florida, generally during the time period that the posts would have

been posted and that this Craig Jungwirth had an extensive history with the
Wilton Manors community in terms of there are multiple stalking allegations and
complaints, there are a whole bunch of other restraining orders against him. So
he's got – he would appear to have had the motive to issue these particular threats.

Ex. 2, Hrg. Tr., at 10:12-23.

Notably, after the prosecutor laid out the United States' probable cause even without

verification that the posts originated from Jungwirth's Facebook account, Jungwirth's counsel at

the time argued that the available information did not support probable cause, and that

Jungwirth's conduct during the initial encounter with law enforcement officials had an innocent

explanation. *See id.* at 13:3-15:18.

Despite hearing Jungwirth's defense counsel's passionate arguments for why the United

States lacked probable cause, the magistrate judge did not dismiss the charges against Jungwirth.

Instead, he set Jungwirth's bond conditions at $250,000, under house arrest with electronic

monitoring, and no use of the internet. *Id.* at 22:13-20. The unmistakable implication is that the

magistrate judge determined that probable cause still existed for the charge against Jungwirth

and for his continued detention, albeit at his mother's house.[4] Because Jungwirth, through his

counsel, had the opportunity to refute the basis for probable cause, and nonetheless, a neutral

magistrate effectively determined that probable cause still existed, under Florida law, probable

cause was conclusively established. *See Burns*, 502 So. 2d at 1218-19.  Accordingly, Jungwirth's

malicious prosecution claim against the United States must be dismissed.

---

[4] Although the magistrate judge suggested at one point in the hearing that the prosecutor may
have an "ethical obligation" to dismiss the charge, *see id.* at 16:25-17:5, he never suggested that
the United States had a *legal* obligation to dismiss the charge because it lacked probable cause.
*Id.* Moreover, the judge's suggestion was in the context of a "prosecutable case," *id.*, that is, a
case in which the evidence could prove beyond a reasonable doubt that Jungwirth committed the
crime. *Id.* at 17:25-18:23. As explained above, that standard is far higher than the standard for
probable cause. *See Chavez*, 832 So. 2d at 747.

## <u>CONCLUSION</u>

The United States, faced with an imminent threat of domestic terrorism a mere two months after the worst terrorist attack in the United States since 9/11, undertook a thorough investigation to locate the source of the threat and to stop it. All reasonably available information led to Jungwirth as the source. A neutral magistrate judge effectively acknowledged as much. The United States had probable cause to arrest, detain, and prosecute Jungwirth. His malicious prosecution claim should therefore be dismissed.


Dated: July 27, 2018                          Respectfully submitted,

                                              CHAD A. READLER
                                              Acting Assistant Attorney General
                                              Civil Division

                                              C. SALVATORE D'ALESSIO, Jr.
                                              Acting Director, Torts Branch

                                              ANDREA W. McCARTHY
                                              Senior Trial Counsel

                                              s/ Paul E. Werner
                                              PAUL E. WERNER
                                              Fla. Special Bar ID No. A5501755
                                              Trial Attorney
                                              United States Department of Justice
                                              Torts Branch, Civil Division
                                              P.O. Box 7146
                                              Ben Franklin Station
                                              Washington, D.C.  20044
                                              (202) 616-4152 (phone)
                                              (202) 616-4314 (fax)
                                              Paul.Werner@usdoj.gov

                                              Attorneys for the United States and
                                              Special Agent Elisa Germano

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2018, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system.

                                                     s/ Paul E. Werner
                                                     PAUL E. WERNER
                                                     Fla. Special Bar ID No. A5501755
                                                    Trial Attorney
                                                     United States Department of Justice
                                                     Torts Branch, Civil Division
                                                     P.O. Box 7146
                                                     Ben Franklin Station
                                                     Washington, D.C.  20044
                                                     (202) 616-4152 (phone)
                                                     (202) 616-4314 (fax)
                                                     Paul.Werner@usdoj.gov