**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-21726-CIV-COOKE

CRAIG JUNGWIRTH,

    Plaintiff,

    v.

UNITED STATES OF AMERICA, *et al.*,

    Defendants.

_____/

## DEFENDANT SPECIAL AGENT ELISA GERMANO'S
## MOTION TO DISMISS PLAINTIFF'S CLAIMS AGAINST HER

Defendant Special Agent Elisa Germano moves this Court under Federal Rule of Civil

Procedure 12(b)(6) to dismiss Plaintiff Craig Jungwirth's constitutional claims against her.

## INTRODUCTION

This case is about a special agent's efforts to prevent a threatened act of domestic

terrorism in the wake of the Pulse nightclub shooting, which claimed the lives of forty-nine

people. In late-August 2016, two months after that shooting, numerous individuals and local law

enforcement notified the Federal Bureau of Investigation (FBI) that someone with the Facebook

screen name "Craig Jungwirth" threatened the gay community of Wilton Manors with violence

exceeding what occurred at Pulse nightclub. Those threats were set to be carried out in six days.

Under pressure and faced with the threat of an imminent terrorist attack, Agent Germano

undertook a thorough investigation, obtaining as much information as she reasonably could in

the handful of days before a proverbial ticking time-bomb exploded. All the available

information Agent Germano's investigation revealed pointed towards Jungwirth as the originator

of those threats. Two days before the time set for the attack, Agent Germano filed a criminal

complaint charging Jungwirth with posting threatening communications. Jungwirth was placed under arrest and detained. Ultimately, the United States dismissed the charges. But not before a neutral magistrate considered the evidence collected, heard from Jungwirth's defense counsel, and determined that the charges should remain.

Jungwirth now attempts to hold Agent Germano personally liable for the arrest and prosecution. His claims should be dismissed. Jungwirth urges this Court to create a remedy in a new context in which Congress has already provided one, and also seeks to hold a law enforcement officer liable for her efforts to confront an imminent threat of horrific terrorist violence that implicated this Nation's security. Under recent Supreme Court and circuit precedent, Jungwirth's efforts should be denied. In addition, Agent Germano is entitled to qualified immunity because she had probable cause to charge Jungwirth.

## BACKGROUND[1]

According to Jungwirth's complaint, on August 30, 2016, an unknown individual using the screen name "Craig Jungwirth" posted on Facebook or a format that appeared to be Facebook the following messages: "My events are selling out cause you f*ggots are total patsies. None of you deserve to live. If you losers thought the Pulse nightclub shooting was bad, wait till you see what I'm planning for Labor Day. . . . You can never catch a genius from MIT and since you

---

[1] For purposes of this motion, the Court may assume the veracity of the well-pled factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 769 (2009). The Court may also consider in a Rule 12(b)(6) motion documents that the complaint refers to whose contents are not disputed and which are central to the claims, provided those documents are attached. *See Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). Two documents, the contents of which are not under dispute, are referred to in the complaint and are presented as central to Jungwirth's claim: the criminal complaint and accompanying affidavit signed by Agent Germano, *see* Compl. ¶¶ 25-36; and the transcript of the November 15, 2016 bond hearing. *See id.* ¶ 40. Those documents are incorporated by reference in this motion and are provided to the Court. *See* Ex. 1, Crim. Compl.; Ex. 2, Bond Hrg. Tr.

f*ggots aren't dying from AIDS anymore, I have a better solution to exterminate you losers. . . . I'm gonna be killing you f*gs faster than cops kill n*ggers. It's time to clean up Wilton Manors from all you AIDS infested losers." Compl. ¶¶ 7, 11; Doc. 4-2. Two months earlier, at the Pulse nightclub, a gay nightclub in Orlando, Florida, a terrorist shot and killed forty-nine people and wounded fifty-three others in what was at the time the deadliest mass shooting by an individual in United States history, and the deadliest attack on United States soil since 9/11. *See* Ex. 1, Crim. Compl., at ¶ 6. Wilton Manors is a gay community located in Miami, Florida. *Id.* at ¶ 4. That year, Labor Day was on September 5, six days after the threats were posted.[2]

Numerous individuals and local law enforcement forwarded the threatening posts to the FBI. Compl. ¶ 14. Agent Germano, a member of the FBI's Miami Joint Terrorism Task Force, then began an investigation with other agents. *Id.* ¶¶ 4-5, 25. Local law enforcement in Wilton Manors identified Jungwirth as a past resident who had been the subject of numerous complaints for harassing and stalking other residents of Wilton Manors. Ex. 1, Crim. Compl., at ¶ 7. The day after the posts appeared, local law enforcement and an FBI agent approached Jungwirth, who refused to speak with the officers and, before the officers had shown him the threats, denied posting them. Compl. ¶¶ 23-24; Ex. 1, Crim. Compl., at ¶ 9.

Over the next several days, Agent Germano learned that Jungwirth had a Facebook account in the name "Craig Jungwirth"; that he had attended MIT; that he had accessed his Facebook account on August 30, 2016, from his mother's house; that he had multiple Facebook accounts, including fake accounts using the likeness of other individuals; that the image of

---

[2] *See* https://www.opm.gov/policy-data-oversight/snow-dismissal-procedures/federal-holidays/#url=2016 (last visited July 11, 2018). Courts may take judicial notice of such undisputed matters as the dates of federal holidays. *See Paniagua v. Comm'r of Soc. Sec.*, No. 15-cv-2038, 2017 WL 699117, at *3 n.7 (S.D.N.Y. Feb. 21, 2017).

"Craig Jungwirth" on the threatening posts was actually that of a disc jockey in the Miami area who was connected to the Wilton Manors community; that Jungwirth had harassed and threatened a denizen of Wilton Manors to such a degree that that person feared for his or her personal safety; that Jungwirth had acted aggressively towards others in Wilton Manors, recently causing a gay establishment to increase its security; and that a restraining order had been entered against him in Wilton Manors one month earlier. *See* Ex. 1, Crim. Compl., at ¶¶ 11-16.

On September 3, two days before Labor Day, Agent Germano filed a criminal complaint against Jungwirth, charging him with a single violation of 18 U.S.C. § 875(c) for transmitting a threatening communication. *Id.* at 1. Jungwirth was arrested and originally held without bond. Compl. ¶ 36. Two weeks later, a grand jury indicted him. *See* Ex. 3, Indictment.[3] On November 15, 2016, at a bond hearing, the United States stated it had received only a screen shot of the post and conceded that it could not locate the original post. Compl. ¶ 39. It therefore could not yet verify that the threats in fact had been posted from Jungwirth's Facebook account, or that Jungwirth had been on his Facebook account at the precise time that the threats were posted, contrary to statements in the affidavit supporting the criminal complaint. *Id.* ¶¶ 30-32, 39. The magistrate judge presiding over the hearing granted Jungwirth a $250,000 bond, but placed him under house arrest with electronic monitoring and no internet use. *See* Ex. 2, Bond Hrg. Tr., at 22:13-20. In January 2017, the United States dismissed the charge. Compl. ¶ 41.

Jungwirth asserts that an unknown individual in Los Angeles, California, posted the threats, not him. *Id.* ¶¶ 7-12. He alleges that Agent Germano knowingly made three false statements in the affidavit supporting the criminal complaint: (1) that Jungwirth's Facebook

---

[3] Courts may take judicial notice of matters of public record in considering a Rule 12(b)(6) motion. *See Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010).

account was the source of the threats; (2) that the IP address at his mother's house was the source of the threats; and (3) that he was on his Facebook account when the threats were posted. *Id.* ¶¶ 30-32. Jungwirth does not dispute any other assertions in the criminal complaint. *See generally* Compl. He claims, however, that Agent Germano made several material omissions in the affidavit, namely, that he was a gay businessman with business interests in the Miami area, and that the image associated with the threats was not him. *Id.* ¶¶ 33-35.

Jungwirth now brings two claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against Agent Germano for purportedly violating his rights under the Fourth Amendment and under *Franks v. Delaware*, 438 U.S. 154 (1978). Jungwirth also brings a single claim against the United States under the Federal Tort Claims Act. The United States addresses that claim in a separate motion. Agent Germano now moves to dismiss Jungwirth's constitutional claims against her because special factors bar those claims and because she is entitled to qualified immunity.

## **ARGUMENT**

Jungwirth's constitutional claims fail for two reasons. First, he seeks to extend *Bivens* into a new context in which Congress has already provided a remedy and in which special factors counsel hesitation. Second, Agent Germano is entitled to qualified immunity because, even absent the alleged misstatements in the affidavit, on September 3, 2016, probable cause, or at bare minimum arguable probable cause, existed to believe Jungwirth had committed the violation for which he was charged. Indeed, the November 15, 2016 bond hearing conclusively demonstrates this point. The magistrate judge was aware of the purported misstatements in the affidavit and the limitations on the United States' evidence. Nonetheless, he did not dismiss the criminal complaint or the grand jury indictment. Instead, he released Jungwirth on bond, placed

him under house arrest, and forbade him from internet use. This conclusively demonstrates probable cause. The claims should therefore be dismissed.

**I.      This Court Should Not Imply a Non-Statutory Remedy in this New Context.**

Jungwirth asks this Court to undertake the disfavored action of extending a judicially implied damages remedy into a new context. Moreover, that new context is one where Congress has already provided a remedy and where special factors counsel hesitation.

**A.      Implying a damages remedy under the Constitution is disfavored.**

**i.      The "*ancien regime*" and *Abbasi*.**

Jungwirth urges this Court to create a damages remedy for him under *Bivens*, an action that "is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). In *Abbasi*, the Supreme Court explained that *Bivens*, decided over forty-five years ago, arose in a different legal "interpretive framework" in which courts "assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose." *Id.* at 1855 (internal quotations and citations omitted). Under this "*ancien regime*," the *Bivens* court "held that courts must adjust their remedies so as to grant the necessary relief when federally protected rights have been invaded." *Id.* (internal quotations and citations omitted). *Bivens* itself provided a damages remedy under the Fourth Amendment for an individual arrested without a warrant in his home in Brooklyn on drug charges. *See Bivens*, 403 U.S. at 389. In the decade after *Bivens*, and still under the then-prevailing legal framework, the Court expanded *Bivens* into only two new contexts: "a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Abbasi*, 137 S. Ct. at 1860.

But in the more than three decades since, the legal landscape has shifted away from implied causes of action, and the Court has "consistently refused to extend *Bivens* to any new

context or new category of defendants." *Id.* at 1857 (citation omitted). Indeed, in the eight cases that came before the Court in that period—nine including *Abbasi*—the Court held that a *Bivens* remedy was not available. *See, e.g.*, *id.* at 1863 (rejecting claims by post-September 11 detainees against Executive Branch officials); *Wilkie v. Robbins*, 551 U.S. 537, 547-48 (2007) (rejecting claims against officials for allegedly pushing "too hard" in the execution of their duties); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001) (rejecting claim against private prison operator). The Court itself has even noted that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1856. Although the Court has not abrogated *Bivens*, it has emphasized—repeatedly—that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (citation omitted).

Accordingly, the Court explained that when a party "seeks to assert an implied cause of action under the Constitution . . . separation-of-powers principles are or should be central to the analysis." *Id.* "The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* (quotation omitted). Because it is "not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others," the Court concluded that the "answer most often will be Congress." *Id.* at 1857-58. That is because when an issue "involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* (quotation omitted); *see also Miller v. U.S. Dep't of Agric. Farm Servs.*, 143 F.3d 1413, 1415 (11th Cir. 1998).

ii.      **The standard for implying a damages remedy.**

*Abbasi* also clarified the standard for evaluating whether to imply a damages remedy under *Bivens*. First, a court must determine whether recognizing a remedy would extend *Bivens* into a new context. The Court narrowly defined "new context" as an instance where "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S. Ct. at 1859. In other words, if the case is different "in a meaningful way" from either Fourth Amendment claims against federal law enforcement officers for a warrantless search and seizure of an individual on suspected drug offenses, *see Bivens*, 403 U.S. at 389; Fifth Amendment claims for the firing of a female congressional secretary based on her gender, *see Davis v. Passman*, 442 U.S. 228, 230 (1979); or Eighth Amendment claims against prison officials for failing to treat an inmate's asthma, causing him death, *see Carlson v. Green*, 446 U.S. 14, 19 (1980), then the context is new.

The Court then offered a non-exhaustive list of examples that could "prove instructive" in determining whether differences are meaningful. *Abbasi*, 137 S. Ct. at 1860. That list included, among others, the following example: "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Id.* Moreover, seemingly minor differences, if meaningful, can present a new context. As the *Abbasi* court noted, "even a modest extension is still an extension." *Id.* at 1864. If a plaintiff seeks to extend *Bivens* into a new context, then the court *must* address whether special factors counsel hesitation. *See id.* at 1860.

To answer that question, the Supreme Court has engaged in a two-step inquiry. The court first asks whether Congress has instituted "any alternative, existing process for protecting" a plaintiff's interests, *Wilkie*, 551 U.S. at 550, or any "meaningful safeguards or remedies" for the plaintiff. *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988). Such actions by Congress imply that it

"expected the Judiciary to stay its *Bivens* hand" and not infer a new damages remedy. *Wilkie*, 551 U.S. at 554; *see, e.g.*, *Abbasi*, 137 S. Ct. at 1863 ("And when alternative methods of relief are available, a *Bivens* remedy usually is not."); *Alvarez v. ICE*, 818 F.3d 1194, 1219-23 (11th Cir. 2016) (holding that Immigration and Naturalization Act provides alternative process that precludes a *Bivens* remedy); *Miller*, 143 F.3d at 1416 (holding that judicial review offered by Administrative Procedures Act provides alternative process that precludes a *Bivens* remedy). That Congress's scheme may not provide the precise remedy a plaintiff seeks does not alter this analysis. *See United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [defendants] an 'adequate' federal remedy for his injuries."); *see also Rauschenberg v. Williamson*, 785 F.2d 985, 988 (11th Cir. 1986) ("Even though the parole law does not provide complete relief . . . 'the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy' counsel against exercise of federal court power to afford [plaintiff] a damages remedy as supplement to the congressional scheme." (quotation omitted)).

Second, even if no alternative process exists, the court considers whether there are any additional "special factors counselling hesitation." *Wilkie*, 551 U.S. at 550. Although the Court "has not defined" that phrase, the "necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. The threshold for being a special factor is quite low. Indeed, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* The *Abbasi* court provided several examples of such special factors. One is a claim that "of necessity" requires "an inquiry into sensitive issues of national security." *Id.* at

1861. As the Court explained, "Judicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" *Id.* (quotation omitted). Those concerns are "even more pronounced" when the inquiry comes in the "context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief." *Id.* That is because the "risk of personal damages liability" may cause an official "to second-guess difficult but necessary decisions" related to national-security policy. *Id.*

**B.  Jungwirth ask this Court to extend *Bivens* into a new context.**

Jungwirth's constitutional claims clearly seek to extend *Bivens* into a new context. None of the three cases extending a *Bivens* remedy—the seminal case, *Davis*, and *Carlson*—involved a context remotely similar to the one here: the investigation and arrest of an individual for using social media to threaten an imminent terrorist attack similar in nature to a horrific attack that occurred two months earlier. The differences between this context and that of the three Supreme Court cases mentioned above are certainly "meaningful." As explained in more detail below, Jungwirth's claims present "the risk of disruptive intrusion by the Judiciary into the functioning of other branches," *Abbasi*, 137 S. Ct. at 1860, namely, federal law enforcement's efforts to prevent terrorist attacks against Americans. Given that "the new-context inquiry is easily satisfied," *id.* at 1865, Jungwirth's claims clearly seek to extend *Bivens* into a new context. This Court must therefore determine whether any special factors counsel hesitation.

**C.  Congress has already addressed claims in this context.**

The first step of this inquiry, whether Congress has provided an alternative process, disposes of Jungwirth's claims. Beyond the "meaningful safeguards" the criminal justice process itself provides, Congress has created a remedy that offers an alternative, existing process for protecting the interests of individuals such as Jungwirth. Through the Hyde Amendment,

Congress has provided a scheme whereby federal courts can award a criminal defendant "a reasonable attorney's fee and other litigation expenses" where he or she is the "prevailing party" in a federal case in which "the position of the United States was vexatious, frivolous, or in bad faith." Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997). The sponsor of the amendment explained that its purpose was to remedy prosecutorial misconduct: "What if Uncle Sam . . . charges you with a criminal violations, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong." *United States v. Gilbert*, 198 F.3d 1293, 1300 (11th Cir. 1999) (citation omitted). In other words, Congress enacted the Hyde Amendment to address the circumstances that Jungwirth alleges in his complaint—an arrest and prosecution purportedly in bad faith.

As the Eleventh Circuit detailed, in enacting the Hyde Amendment, Congress weighed the benefits and drawbacks of providing remedies for claims of bad-faith prosecutions and tailored the final version of the amendment with those considerations in mind. *See Gilbert*, 198 F.3d at 1299-1303 (tracing the amendment's legislative history). The Hyde Amendment, based on Congress's judgment, strikes "the proper balance" of "deter[ing] unjustifiable government conduct" while not "inhibit[ing] the aggressive prosecution of justifiable cases." Statement of Hon. Henry J. Hyde Before House R. Comm. on Amend. H.R. 2267, 1997 WL 545756 (Sept. 5, 1997). That judgment warrants deference when courts are asked to consider whether to supplement the statutory remedy with a judicially created damages remedy. *See Rauschenberg*, 785 F.2d at 988. Indeed, allowing claims such as Jungwirth's to proceed "would have a chilling effect on law enforcement officers." *Vennes v. An Unknown Number of Unidentified Agents of the U.S.*, 26 F.3d 1448, 1452 (8th Cir. 1994). As the Court noted in *Bush v. Lucas*, "The selection

of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them." 462 U.S. 367, 380 (1983) (quotation omitted).

### D.  Special factors counsel hesitation in this context.

Compounding the above concerns about "inhibiting the aggressive prosecution of justifiable cases" and the "chilling effect on law enforcement officers" a judicially created damages remedy could cause is the specific context of this very case. Namely, federal law enforcement officers' dogged efforts to locate and neutralize an individual who through social media had threatened to carry out, in short order, a mass shooting that would surpass the devastation of a recent horrendous attack. It is hard to imagine a scenario in which Congress, and indeed society as a whole, would be *less inclined* to "chill" law enforcement than the ticking time-bomb scenario, which the online posts presented. In such a scenario, the threat of a damages remedy, which may cause officers to hesitate before taking decisive action to save lives out of fear of the potentially ruinous liability they could face for any mistakes, would be contrary to Congress's expressed interests. *Cf. Abbasi*, 137 S. Ct. at 1861. It would create the very dynamic Congress sought to avoid by modifying the proposals that lead to the Hyde Amendment.

Relatedly, the posts threatening vast and indiscriminate carnage posed a risk to national security. Implying a damages remedy in this case, which may affect law enforcement's response to similar future threats of domestic terrorism, thus implicates national security. Multiple circuits have dismissed *Bivens* claims that raised such concerns. *See, e.g.*, *Hernandez v. Mesa*, 885 F.3d 811, 818-19 (5th Cir. 2018) (dismissing claims against Border Patrol agent and citing national security concerns); *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017) (dismissing claims against TSA agents and citing national security concerns); *Meshal v. Higgenbotham*, 804

12

F.3d 417, 425-26 (D.C. Cir. 2015) (dismissing claims against FBI agents and citing national

security concerns); *Lebron v. Rumsfeld*, 670 F.3d 540, 549 (4th Cir. 2012) (dismissing claims

against civilian and military officers and citing national security concerns); *Arar v. Ashcroft*, 585

F.3d 559, 575 (2d Cir. 2009) (en banc) (dismissing claims against law enforcement officers and

citing national security concerns). Those cases provide clear guidance here. This Court should

refrain from implying the damages remedy Jungwirth seeks. His claims should be dismissed.

## II.    Agent Germano Is Entitled to Qualified Immunity.

Even if special factors did not bar Jungwirth's claims, which they do, those claims should

be dismissed because Agent Germano is entitled to qualified immunity. Jungwirth seeks

damages from the personal resources of an individual federal official. Such personal-capacity

suits "entail substantial social costs, including the risk that fear of personal monetary liability and

harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v.*

*Creighton*, 483 U.S. 635, 638 (1987). In light of these concerns, government officials performing

discretionary functions are protected by qualified immunity and cannot be liable unless their

actions violate "clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

For a right to be clearly established, the "contours" of the right "must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right." *Anderson*,

483 U.S. at 640. The Court has "repeatedly" instructed lower courts "not to define clearly

established law at a high level of generality." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011).

Instead, the law must be defined "in a more particularized, and hence more relevant, sense."

*Anderson*, 483 U.S. at 640. In essence, qualified immunity contains a "fair notice" requirement.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002). It is meant to protect all but the "plainly incompetent"

or those who "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Although guiding precedent need not be directly on point for a right to be clearly established, "existing precedent must have placed the . . . constitutional question *beyond debate*." *Al-Kidd*, 563 U.S. at 741 (emphasis added). Therefore, to overcome a qualified immunity defense, a complaint must demonstrate both that a constitutional right was violated, and that the contours of the right violated were clearly established "beyond debate." *Id.* Here, Jungwirth has failed to allege facts demonstrating that any constitutional right was violated. At bare minimum, he has failed to allege the violation of a clearly established right.

### A.  Probable Cause Existed To Support the Charge.

The Fourth Amendment requires that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. At the time Agent Germano executed the affidavit, there existed ample probable cause to believe Jungwirth had posted online explicit threats of egregious harm against a specific community that had recently suffered a horrific attack. The facts supporting probable cause were set forth in the affidavit. Therefore, Jungwirth's Fourth Amendment claims fail.

As the "very name implies," probable cause deals with "probabilities," which are "not technical," but rather "are the factual and practical considerations of everyday life on which reasonable and prudent" individuals act. *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Thus, probable cause allows for "some mistakes on their part," so long as those mistakes are "reasonable," based on "facts leading sensibly to" those reasonable individuals' conclusions. *Id.* at 176. The level of proof needed to demonstrate probable cause is less than the level necessary to show a preponderance of the evidence. *See Nnadi v. Richter*, 976 F.2d 682, 687 (11th Cir.

14

1992) (citation omitted); *Montgomery v. Brickell Place Condo. Ass'n*, No. 11-cv-24316, 2012 WL 1203837, at *2 (S.D. Fla. Apr. 11, 2012) (citation omitted). It certainly is less than that needed to show proof beyond a reasonable doubt. *Cf. Smith v. Sheriff, Clay Cnty., Fla.*, 506 F. App'x 894, 900 (11th Cir. 2013) (noting "it would be passing strange" to find credibility of witness defeated probable cause where convictions sustained with less credible testimony).

For probable cause to exist, an arrest must be "objectively reasonable under the totality of the circumstances." *Bailey v. Bd. of Cnty. Comm'rs of Alchua Cnty.*, 956 F.2d 1112, 1119 (11th Cir. 1992) (citation omitted). That standard is met when the "facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . or is about to commit an offense." *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (citation omitted). And although an arresting officer is required to conduct a reasonable investigation, she need not "take every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person." *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) (citation omitted). Moreover, an arresting officer need not "rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct, 577, 588 (2018).

Under the "totality of the circumstances," the gravity of a crime and the exigencies surrounding it inform the reasonableness of an officer's efforts to establish probable cause. The amount of information officers must gather to establish probable cause "is in inverse proportion to the gravity of the crime and the threat of its imminent repetition." *Mason v. Godinez*, 47 F.3d 852, 856 (7th Cir. 1995). *See United States v. Bustamante-Gamez*, 488 F.2d 4, 8 (9th Cir. 1973) (noting "[t]ime was clearly of the essence" in finding probable cause for arrest).

### i.   The crime committed.

Applying the above principles to the undisputed facts in this case, there can be little doubt that Agent Germano had probable cause to charge Jungwirth with making online threats. Jungwirth was charged with violating 18 U.S.C. § 875, *see* Ex. 1, Crim. Compl., at 1, which makes it a crime to transmit "in interstate . . . commerce any communication containing . . . any threat to injure the person of another." § 875(c). Jungwirth does not dispute that the online communications at issue here involved interstate commerce and contained a "threat to injure the person of another." Thus, the only question is whether Agent Germano had probable cause to believe that *he* was the one who posted those threats when she filed charges. Given the information reasonably available at the time, she clearly did. *See Anderson*, 483 U.S. at 641 ("[T]he determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials."); *United States v. Webster*, 314 F. App'x 226, 229 (11th Cir. 2008) (whether officer has reasonable suspicion for stop is "based on the information available to the officer at the time" (citation omitted)).

### ii.   Connections between Jungwirth and the threats.

First, what reasonably appeared to be a series of threatening Facebook posts were from the screen name "Craig Jungwirth." *See* Doc. 4-2. Agent Germano verified that Jungwirth in fact had an account with Facebook in the screen name "Craig Jungwirth." *See* Ex. 1, Crim. Compl., at ¶ 11. Second, the posts referred to "Craig Jungwirth" as having studied at MIT. Doc. 4-2. She verified that Jungwirth had attended MIT and listed an MIT address as one of the email accounts associated with his Facebook page. *See* Ex. 1, Crim. Compl., at ¶ 11. Third, based on the information available at the time, although the posts did not provide the precise time they came

online, they appeared to have been posted on August 30, 2016. Compl. ¶¶ 7-12. Agent Germano

verified that Jungwirth had accessed his Facebook page, named "Craig Jungwirth," on that day

from an IP address associated with his mother's house. *See* Ex. 1, Crim. Compl., at ¶¶ 11, 16.

### iii.   Connections between Jungwirth and Wilton Manors.

Fourth, the posts threatened the gay community of "Wilton Manors." Doc. 4-2. Agent

Germano verified that Jungwirth had associations with the gay community of Wilton Manors in

Miami, Florida. *See* Ex. 1, Crim. Compl., at ¶ 13. She also learned additional relevant

information that supported a reasonable belief that Jungwirth had posted the threats. Namely, she

learned that multiple complaints had been filed against him for "stalking and harassing

behavior," along with "incidents of sabotage, vandalism, and trespassing," *id.* at ¶ 12; that one

nightclub in that community had "increased security" recently because of Jungwirth and his

"aggressive" behavior, *id.* at ¶ 13; that Jungwirth had bombarded an individual in Wilton Manors

with "thousands of threatening text messages, Facebook messages, and phone calls," often

stating "I'm going to get you"; that this individual had obtained a restraining order against

Jungwirth in mid-July 2016, six weeks before the threatening Facebook posts here; and that

because of Jungwirth, this individual "feared for their physical safety." *Id.* at ¶ 15.

And fifth, Agent Germano learned that Jungwirth had "multiple Facebook profiles," had

created "false online profiles" using other individuals' names and likenesses, *id.*, and that the

photograph included with the threatening posts at issue here was of another individual who

worked in the Miami area and who was not Jungwirth. *Id.* at ¶ 13. (Thus, the affidavit itself

conclusively disproves Jungwirth's allegation that the affidavit omitted the fact that the

corresponding photograph was not of Jungwirth. *See* Compl. ¶ 33.) Additionally, when officers

first approached Jungwirth to discuss the posted threats, before the officers had shown him the

threats, he denied posting them. *See* Ex. 1, Crim. Compl., at ¶ 9. That suspicious behavior further supported a finding of probable cause. Jungwirth then refused to speak with the officers without his attorney. Compl. ¶ 24.

### iv.   Under the totality of the circumstances, there was probable cause.

When considering the "totality of the circumstances," including the severity of the crime the posts threatened and the imminence of that crime, the above undisputed facts would have led a reasonable officer to believe that Jungwirth had committed a crime and should be arrested. The posts threatened to commit an act of terrorism exceeding the Pulse nightclub shooting—which killed forty-nine people and wounded fifty-three others—and targeted a similar community, the gay community in Wilton Manors. This threat came a mere two-and-a-half months after that horrific shooting; was associated with the name of an individual, Jungwirth, who lived in Orlando, the site of the shooting; and targeted a similar community in the same state. All reasonably available information pointed towards Jungwirth as the perpetrator of the online threats posted in his name, and supported the conclusion that he had a motive to carry them out.

The alleged misstatements in the affidavit do not alter this analysis. That is because, as described above, Agent Germano had probable cause without those misstatements. The undisputed information otherwise contained in the criminal complaint against Jungwirth still provided probable cause. That disposes of Jungwirth's claim under *Franks*. *See* 438 U.S. at 171 (holding that "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content . . . to support a finding of probable cause," then no violation). And regarding the purported omissions Jungwirth raises—one of which in fact was not omitted from the affidavit, *see supra*, p.17—even assuming those omissions would have been exculpatory, an officer is under no obligation to provide exculpatory information to a judge when

filing a complaint or to a grand jury when seeking an indictment. *See United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004) ("The government is under no duty to bring exculpatory evidence to the grand jury's attention.").

Moreover, the November 15, 2016 bond hearing before a magistrate judge demonstrates that the alleged misstatements and omissions in the affidavit do not negate probable cause. Indeed, that hearing conclusively establishes that Agent Germano had probable cause. At the hearing, the issue of those misstatements was argued before a magistrate. The judge, informed by the prosecutor that he could not then confirm who posted the threats and precisely when they were posted, asked, "What was the basis for your probable cause then?" Compl. ¶ 40. The prosecutor responded as follows: the post was in the name of Jungwirth, he had a Facebook page and was online at his mother's house during the general period the posts appeared, he had attended MIT, and he had a history with the Wilton Manors community that included complaints and restraining orders. *See* Ex. 2, Bond Hrg. Tr., at 10:12-23.

Jungwirth's counsel at the time then argued that the available information did not support probable cause, and that Jungwirth's conduct during the initial encounter with law enforcement officials had an innocent explanation. *See id.* at 13:3-15:18. Yet despite those passionate arguments for why probable cause was lacking, the magistrate did not dismiss the charges. Instead, he set Jungwirth's bond conditions at $250,000, under house arrest with electronic monitoring, and no use of the internet. *Id.* at 22:13-20. The unmistakable implication is that the magistrate determined that probable cause still existed for the charge against Jungwirth and for his continued detention, albeit at his mother's house. That is conclusive of probable cause and disposes of Jungwirth's claims. *See United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) ("A magistrate's decision that probable cause exists is conclusive absent arbitrariness.").

**B.  At bare minimum, Agent Germano had arguable probable cause.**

Even assuming that the above undisputed facts and the magistrate's determination do not establish probable cause, the information available to Agent Germano certainly provided her with *arguable* probable cause to file the charge against Jungwirth. She therefore is entitled to qualified immunity. Under Eleventh Circuit precedent, to receive qualified immunity, "an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (citation omitted). Arguable probable cause exists where, based on the circumstances and information available, a reasonable officer "*could have believed* that probable cause existed." *Id.* (emphasis added and citation omitted). To the extent any question remains over whether actual probable existed, there can be little doubt that Agent Germano had arguable probable cause. Faced with the information she collected and the totality of the circumstances at hand, a reasonable officer would have believed she had probable cause to charge Jungwirth. Agent Germano is therefore entitled to qualified immunity.

## <u>CONCLUSION</u>

Jungwirth asks this Court to hold Agent Germano liable for her efforts to prevent an imminent terrorist attack coming in the wake of an earlier attack. This scenario is not one in which Congress wants law enforcement officers to be concerned about their personal liability if they make mistakes. And Congress has already provided a remedy for circumstances such as these. Moreover, Agent Germano had probable cause, or at least arguable probable cause, as the undisputed facts demonstrate and the neutral magistrate determined. Jungwirth's constitutional claims should be dismissed.

Dated: July 27, 2018                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General
                                        Civil Division

                                        C. SALVATORE D'ALESSIO, Jr.
                                        Acting Director, Torts Branch

                                        ANDREA W. McCARTHY
                                        Senior Trial Counsel

                                        s/ Paul E. Werner
                                        PAUL E. WERNER
                                        Fla. Special Bar ID No. A5501755
                                        Trial Attorney
                                        United States Department of Justice
                                        Torts Branch, Civil Division
                                        P.O. Box 7146
                                        Ben Franklin Station
                                        Washington, D.C.  20044
                                        (202) 616-4152 (phone)
                                        (202) 616-4314 (fax)
                                        Paul.Werner@usdoj.gov

                                        Attorneys for the United States and
                                        Special Agent Elisa Germano

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system.

s/ Paul E. Werner
PAUL E. WERNER
Fla. Special Bar ID No. A5501755
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, D.C.  20044
(202) 616-4152 (phone)
(202) 616-4314 (fax)
Paul.Werner@usdoj.gov
